### Illinois Central Railroad Company v. Holmes.

(Decided October 31, 1922.)

## Appeal from Graves Circuit Court.

1. Railroads—Negligence—Damages.—One who is upon a street crossing in a city and is struck by a moving train in the dark, may recover damages if he was not guilty of such contributory negligence as but for which he would not have been injured.

2. Railroads—Negligence—Damages.—Evidence examined and held there was sufficient proof of negligence upon the part of the

railroad company to take the case to the jury and to sustain the verdict.

ROBBINS & ROBBINS, R. V. FLETCHER and TRABUE, DOOLAN, HELM & HELM for appellant.

HOLIFIELD & McDONALD for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

Appellee Holmes, on December 12, 1913, while on a grade crossing in the city of Mayfield, Kentucky, was struck by a passing train and injured in many parts of his body and especially in his left foot and leg, so that said foot was necessarily amputated, and he brought this action in the Graves circuit court against the Illinois Central Railroad Company to recover damages for his injuries, and was awarded $500.00 on a jury trial. The railroad company appeals from the judgment entered upon that verdict.

It is the insistence of the railroad company that while the scintilla rule requires the submission of a case like this to the jury, yet if the verdict is flagrantly and palpably against the evidence the court should set aside the verdict and grant a new trial. C. & O. Railway Co. v. Johnson, 151 Ky. 809; Dailey v. Lexington and Eastren R. R. Co., 180 Ky. 668. There are a great number of cases in Kentucky to the same effect. That this is the correct rule cannot be gainsaid. Appellee Holmes insists that there is abundant evidence to support the verdict.

Appellee Holmes lived at Wingo, Kentucky, ten miles south of Mayfield, and thirty-three miles from Paducah. On the day of the accident appellee bought a round-trip ticket from Wingo to Paducah and took a train for the last named town. After arriving at Paducah he attended to some business, bought some cigarettes and then a friend said to him, "Let's go over and buy a drink;" he took one drink of whiskey in the forenoon and then ate dinner. About three o'clock in the afternoon he took another drink. Both of these drinks appellee says were small. While in Paducah he purchased for a friend a pint of whiskey and put it in his hip pocket; he also bought four quarts of whiskey which he put in his handbag for two friends; about 4:30 p. m. he boarded the train at Paducah for Wingo, carrying with him his handbag. About the time he arrived at

Mayfield, he observed that his bag was gone and he began to look through the car for it; he made inquiry of different passengers to know if they had seen it, and some one. or more of the passengers told him that a man dressed in corduroy took his grip and left the car about the time the train pulled into Mayfield.  On receiving this information appellee left the train in search of the man dressed in corduroy.  He looked in a number of automobiles to see if he could find his handbag and then went to the station and other places looking for the man whom the other passengers in the coach described as carrying away his handbag.  He returned to the coach one time and made a more diligent search for his grip, thinking it might be under the seat, and after a futile effort he again inquired of the passengers if they knew who it was that took his grip, and then asked for a more definite description of the man.  This was again given, and appellee was told that the man carrying the grip went in the direction of a certain building not far away. The railroad tracks were on every side and this building was in the yards.  He went to this building but did not find the man dressed in the corduroy or appellee's handbag.  Then he started in another direction, crossing the yards, hoping to find the culprit.  In the meantime he met several persons whom he knew and told them about the loss of his handbag, and asked concerning a man dressed in corduroy.  In doing this he conversed with a number of persons in and about the railroad yards. While he was making this search the engine which was pulling the train on which he had been riding had run down the tracks for some distance and got on to a passing track to come back beyond where the train stood and connected a poultry car and shifted it on the yards.  Appellee had reached the grade crossing of Water street over one of the tracks of appellant.  He was intending to go further south in search of the man with his. suitcase, but the yards were so dark at that point at that hour in the evening that he could scarcely see where he was going, and so after barely crossing the intersection he turned on his heel, glanced toward Pryorsburg and was going back in the direction from which he had came, when without warning, as he says, he was suddenly and unexpectedly struck in the back and shoulder by the pilot beam on the front of the engine which knocked him almost senseless, his feet being thrown rather under the train and his body away from the train.  In. falling one

of his feet was caught under some part of the train and so mashed and lacerated that it was necessarily amputated. He also received injuries in his back and side and in his head and other parts of his body, and for some time after the injury he was practically unconscious. The pint bottle of liquor in his hip pocket was broken and spilt, and this gave a strong smell of whiskey to the crowd which came up immediately to see what had happened. Appellee was taken on a train very soon after his injury to a hospital at Paducah, where his foot was amputated and he was otherwise treated and cared for. According to his testimony he was wholly unaware of the approach of the train to the grade crossing of the street on which he was standing at the time he was struck. He says there was no signal given either by bell or whistle and that he did not see any light; that is was then very dark at the place he was traveling and that the train was going about tweney miles per hour. Evidently a large electric light which usually burned at that point at certain hours in the night was not on, if his evdence be true, for if so it woud not have been dark. He is corroborated in this by some other witnesses who spoke of the darkness. Soon after the injury of appellee a great number of persons gathered around him and they had to strike matches in order to discover who the injured person was. Other witnesses also testified that there was no whistle or ringing of the bell by the train on its approach to the intersection. On the other hand, there are witnesses who testify that the bell was ringing and that the whistle sounded about the time it struck appellee. It was the duty of the train operatives in charge of the engine which struck appellee to keep a lookout ahead for persons on the public crossing at the place where appellee was struck and to control their train and so manage it as not to come in contact with such persons and to ring the bell and sound the whistle continuously or alternatively for some rods back until the crossing was passed. This, according to plaintiff's evidence, was not done. He had no warning whatever of the approach of the train. Of course, upon the company's behalf the evidence tends to show that the electric light was burning at that crossing; that the bell on the engine was constantly ringing when it approached the intersection and that appellee was so drunk that when the engineer saw him he was reeling from side to side and unable to walk straight. We think a large part of the drunkenness

charged against appellee arose out of the fact that he smelled strongly of liquor when the crowd gathered immediately after the accident, for a pint of whiskey had been spilt on him.   He had during the day taken two drinks, but that was not enough to intoxicate him at that hour in the evening.   Besides that many persons who met and conversed with him after he alighted from the train in search of his grip positively state that he did not act like a man under the influence of intoxicating drinks and that they did not smell whiskey or notice anything in his conduct or speech which indicated he was not normal in every respect.  Some of these persons had just conversed with him a few minutes before the accident.

All these matters considered, we are constrained to the view that there was not only evidence sufficient to carry the case to the jury, but ample evidence to support the verdict.

Judgment affirmed.